
03/26/2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| **JOE EARL RITTER** § | | |
| xxx-xx-7064 § | Case No. 07-61071 | |
| **and PATSY ANN RITTER** § | | |
| xxx-xx-8729 § | | |
| 267 CR 120, Carthage, TX  75633 § | | |
| § | | |
| Debtors § | Chapter 12 | |
| JOE EARL RITTER and § | | |
| PATSY ANN RITTER § | | |
| § | | |
| Plaintiffs § | | |
| § | | |
| v. § | Adversary No. 08-6008 | |
| § | | |
| CITIZENS BANK § | | |
| § | | |
| § | | |
| Defendant § | | |

## MEMORANDUM OF DECISION

This matter is before the Court to consider the "Complaint to Determine Validity or Extent of a Lien or Other Interest in Property" (the "Complaint") filed by the Plaintiff-Debtors, Joe Earl and Patsy Ritter (the "Debtors") through which they seek a declaration that the lien purportedly held by the Defendant, Citizens Bank (the "Bank"), upon a 6.947-acre tract of real property is void as an impermissible encumbrance upon the Plaintiffs' homestead under the applicable sections of the Texas Constitution and the Texas Property Code. At the conclusion of the trial, the Court took the matter under

advisement. This memorandum of decision disposes of all issues before the Court.[1]

## Background[2]

The Debtors have operated a poultry and cattle farm near Carthage, Texas since 1982. In mid-1998, the Debtors' rural homestead encompassed just over 64 acres comprised of two contiguous tracts: (1) a 57.23-acre tract with road frontage upon which the Debtors' home actually sat; and (2) a land-locked 6.947-acre tract upon which sat four chicken houses utilized in the Debtors' poultry business and a water well dug in 1985 which was utilized for the Debtors' home as well as in their farming operations.[3]

On July 28, 1998, in an effort to refinance certain farming equipment, the Debtors turned to their banker, C.J. Wilson, with whom the Debtors had secured business loans in the past during his tenure at the First National Bank and who therefore had knowledge of the scope of the Debtors' business operations. Mr. Wilson had since become affiliated with Citizens Bank and the Debtors contacted Mr. Wilson to determine whether funds could be obtained for their business needs from his new employer. The Debtors thereafter applied for a loan from Citizens Bank in the amount of $122,253.00 in their

---

[1] This Court has jurisdiction to consider the Plaintiffs' Complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(B) and (K).

[2] The agreed facts identified by the parties in the Pre-Trial Order [dkt #10] are incorporated herein by reference as if fully set forth.

[3] A third tract consisting of 62.475 acres was acquired by the Debtors in 2000 from Mrs. Ritter's brother but is not germane to the current dispute.

individual names. The Bank made a loan commitment to the Debtors subject to certain enumerated conditions,[4] among which was the requirement that the loan be secured by a deed of trust on the 6.97-acre tract and the four chicken houses. Truth-in-lending disclosures and other information were tendered to the Debtors that reflected, as did the executed loan commitment, that the loan would be issued to the Debtors in their individual capacities.[5] Subsequently, notwithstanding the executed documents, Mr. Wilson informed the Debtors that they would need to incorporate their poultry business in order to obtain the loan. In light of their need for the refinancing and their past association with Mr. Wilson, the Debtors agreed to the proposal without further inquiry. They were told that they would not receive the money without these transactions. Therefore, they agreed to the transactions. Mr. Wilson told the Debtors that Robert Sherman, a local attorney, would prepare all of the necessary paperwork for their signatures and that they would be contacted when the papers were ready. Mr. Sherman performed a significant portion of the Bank's legal work. The Debtors did not know Mr. Sherman, nor did they ever ask him to form a corporation or to perform any other legal service for their benefit.[6] Mr. Sherman was the Bank's attorney.[7] Indeed, the Debtors

---

[4] Plaintiffs' Ex. 5.

[5] Plaintiffs' Ex. 1 through 4.

[6] Indeed upon receipt of the corporate minute book from Sherman's secretary, the Debtors simply carried the book home and placed it in their safe without further action. See Plaintiffs' Ex. 16.

[7] It is acknowledged that legal fees to Mr. Sherman and all expenses for creating the corporation were paid from the loan proceeds .

did not ever meet or talk with Mr. Sherman. When the documents were ready, Mr. Sherman's secretary contacted the Debtors, presented the documents to them and indicated the proper places to sign.[8] They subsequently signed the remaining loan documents at the Bank, with Mrs. Ritter carrying the documents to her automobile to obtain her husband's signature.[9] The loan documents included: (1) a warranty deed from the Debtors transferring the 6.947 acres to their new corporation, Pat Ritter Poultry Farm, Inc.;[10] (2) a promissory note in the corporate name and signed by Mrs. Ritter as "President," which she testified was "what Sherman's secretary told me I was when she handed me the book";[11] (3) a deed of trust on the 6.947 acres similarly executed by Mrs. Ritter;[12] and individual guaranty agreements.[13] No one ever counseled the Debtors as to the impact of the incorporation documents or informed them of any effect that such action would have upon their existing homestead.

The Debtors proceeded to use the loan proceeds to pay their individual obligations on the farm equipment and to satisfy other personal indebtedness. The Debtors never

---

[8] This included a corporate resolution to buy the 6.9-acre tract. See Defendant's Ex. J.

[9] The settlement statement erroneously references Mr. Sherman's office as the settlement location. See Plaintiffs' Ex. 6.

[10] Plaintiffs' Ex. 7. The warranty deed was with a reservation of a vendor's lien and provided that superior title was retained by the Debtors, subject to the Deed of Trust to the Bank, until the promissory note to the Bank was paid in full.

[11] Plaintiffs' Ex. 8.

[12] Plaintiffs' Ex. 9.

[13] Plaintiffs' Ex. 10.

subsequently conducted actual business operations through the corporate entity. There is no evidence that they paid corporate franchise taxes to the Texas Comptroller. Because legal title to the tract was in the corporate name, Mrs. Ritter apparently signed (though in an individual capacity) at least one financing statement listing the corporation as a debtor in the purchase of certain brooder lights utilized in the chicken houses sitting on the 6.9 acres.[14] A corporate bank account was created into which the Debtors would deposit only such amounts as were necessary to make the quarterly loan payments. At the insistence of their local bookkeeper, corporate tax returns were prepared for the corporation during the duration of the loan.[15]

In 2005, the Debtors renewed the note at the Bank for the $79,670.59 balance existing from the 1998 note. The transaction was completed in the corporate name and closed with documents generally identical to those utilized in the 1998 transaction.[16] The final paragraph of the 2005 deed of trust specifically recognized that:

> the indebtedness, payment of which is hereby secured, is in renewal and extension of that certain Deed of Trust executed by Pat Ritter, President and CEO of Pat Ritter Poultry Farm, Inc. in favor of Citizens Bank, Carthage, Texas, dated October 30, 1998 . . . securing a promissory note in the original principal sum of $122,800.00.[17]

---

[14] Defendant's Ex. I.

[15] *See, e.g.,* Defendant's Ex. H.

[16] *See* Plaintiffs' Ex. 11-14.

[17] Plaintiffs' Ex. 12. Mrs. Ritter claimed that she subsequently "dissolved" the corporation in 2005 and that no corporate tax returns have been filed since then. However, no corroborating evidence

Even after the refinancing of the Citizens Bank debt, the Debtors' business operations continued to suffer.  Finally, on October 28, 2007, the Debtors filed a voluntary petition for relief under Chapter 12 of the Bankruptcy Code.  In their original schedules, the Debtors listed the 6.9-acre tract on Schedules A and D as their individual property subject to a security interest of Citizens Bank but, interestingly, originally failed to claim that tract as exempt on Schedule C.[18]  However, the Debtors filed the current complaint on April 21, 2008, seeking a declaration that the Bank's lien upon that 6.9-acre tract is invalid under Texas law.  In furtherance thereto, an amended Schedule C was filed on December 3, 2008, in which the Debtors claimed that tract, along with the two adjoining tracts, as their homestead.  All creditors were given proper notice of that amended exemption claim and it has now been allowed due to the lack of any timely objection under Fed. R. Bankr. P. 4003.

## Discussion

The homestead protection is an integral part of the Texas legal landscape.  This Court has often referenced the long and distinguished history of the homestead exemption under Texas law and its stated purpose of providing a home and a means of support for a

---

was introduced at trial by which the Court can determine the current status of the corporation.

[18] However, a formal reversal of the prior transfer of the 6.9-acre tract to the corporation was not completed until February 25, 2008 through the execution of a warranty deed from the corporation back to Mr. and Mrs. Ritter.  See Plaintiffs' Ex. 15.

debtor and his family so as to promote family unity. *See 1018-3rd St. v. State,* 331 S.W.2d 450, 453 (Tex. Civ. App. — Amarillo 1959, no writ); *see also England v. FDIC (In re England)*, 975 F.2d 1168, 1174 (5th Cir. 1992) ["Texas cases have consistently held that the fundamental purpose of the Texas homestead laws is to secure a place of residence against financial disaster."] (*citing Cocke v. Conquest*, 120 Tex. 43, 35 S.W.2d 673, 678 (1931)).

This constitutional mandate protects a debtor's homestead from seizure for the claims of creditors, except for encumbrances which are "properly fixed" on the homestead property.[19] After precisely describing the limited number of permitted encumbrances,[20] §50(c) of Article 16 of the Texas Constitution proclaims that:

> No mortgage, trust deed or other lien on the homestead shall ever be valid unless it secures a debt described by this section. . . . All pretended sales of the homestead involving any condition of defeasance shall be void.

3 TEX. CONST. ANN., art. XVI, §50(c) (Vernon Supp. 2008).

"The doctrine of pretended sale provides that when a sale of a homestead occurs, whether by fraudulent representations or transfers, the sale will be treated as void and the homestead owner will not lose the protections afforded by the Texas Constitution." *Vogel v. Veneman (In re Vogel)*, 276 F.3d 729, 734 (5th Cir. 2002). It has been widely acknowledged for a century and a half that the Texas homestead exemption is to be

---

[19] TEX. PROP. CODE ANN. §41.001(a) states that "[a] homestead . . . [is] exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property."

[20] TEX. PROP. CODE ANN. §41.001(b) also lists the permitted encumbrances.

liberally construed. *Woods v. Alvarado State Bank*, 19 S.W.2d 35 (Tex. 1929) ["The rule that homestead laws are to be liberally construed to effectuate their beneficent purpose is one of general acceptance."] (*citing Trawick v. Harris*, 8 Tex. 312 (Tex. 1852)).

The Texas homestead protection thus stands as a rare exemplar of a public policy consideration capable of superseding the usual legal ramifications of a contractual transaction. It can neutralize the ignorance and improvidence of affected borrowers. It can penalize the complicity of colluding lenders. It authorizes, indeed encourages, a close examination of any set of circumstances under which the homestead rights of Texas citizens are relinquished, particularly those occurring within periods of financial distress, to insure that such acts of relinquishment are consistent with the constitutional protections. No means of evasion — no means of execution — are free from scrutiny or exempt from reversal. *See, e.g., Anglin v. Cisco Mortgage Loan Co.*, 135 Tex. 188, 192, 141 S.W.2d 935, 937(1940) [outlining that it is "the duty of trial court, in the first instance, to look beyond the language of the purported deed and to consider if, from the facts and circumstances surrounding its execution, and in evidence, an issue of fact was created which showed or tended to show that the intent of the grantors (the debtors) was to fix a lien upon the homestead in contravention of the Constitution."].

Texas law has always required any homestead claimant to make an initial demonstration that the property claimed as homestead actually qualifies for the homestead exemption. *See, e.g., Perry v. Dearing (In re Perry),* 345 F.3d 303, 311 (5th Cir. 2003)

["The claimant has the initial burden of establishing homestead status."] (*citing Burk Royalty Co. v. Riley,* 475 S.W.2d 566, 568 (Tex. 1972)); *Bradley v. Pac. Southwest Bank (In re Bradley),* 960 F.2d 502, 507 (5th Cir. 1992). To establish homestead rights under Texas law, "a party must show overt acts of homestead usage, and an intention on the part of the owner to claim the property as homestead." *Wilcox v. Marriott*, 103 S.W.3d 469, 472 (Tex. App. – San Antonio 2003, pet. denied) (citations and internal quotations omitted).

The fact that the Debtors' 6.97-acre tract was impressed with a homestead character at the time of the initial loan transaction in 1998 is not seriously contested. The subject tract was contiguous to the 57-acre tract upon which the Debtors' home is located. It was utilized to grow hay and to raise chickens in order to supplement the family income. As the Bank's representative, Mr. Wilson was certainly aware of the Debtors' business activities and the utilization of that tract in those activities because of his past business dealings with the Debtors at another bank. That knowledge was obviously passed along to other Bank personnel which created the Bank's concern regarding the limitations that the homestead character of the property imposed. Thus, the subject tract did constitute a portion of the Debtors' homestead at the time of the loan transaction.

Once homestead rights in a tract have been established, the burden to prove the

termination of the homestead protection is on the opposing party.[21] To meet that burden, the Bank relies solely upon the execution of the warranty deed from the Debtors to the newly-created poultry corporation. It essentially asserts that the existence of that conveyance terminates the Debtors' homestead rights per se. However, the mere fact that the Debtors signed a deed to a self-controlled corporation at the suggestion of the Bank is not singularly sufficient to terminate the Debtors' homestead rights in the subject tract. Instead, Texas law instructs that it is the intention of the parties as to whether or not title is to vest in the grantee through the conveyance that is integral in determining whether a sale is real or pretended. *See Hardie & Co. v. Campbell*, 63 Tex. 292 (1885). As one court observed,

> The key issue to be resolved in determining whether a sale is real or pretended is the factual question of whether the parties intended title to vest in the purchaser. If the transfer is intended to be bona fide, a sale is not pretended.
> If a bank advances funds secured by a lien on a homestead with knowledge or notice that the sale was a pretense, the lien is void. If, however, the bank advanced the money in reliance on the apparent genuineness of the sale, without knowledge of the subterfuge or of facts that would put a reasonable lender on notice, the lien can be enforced.

*Ketcham v. First Nat'l. Bank of New Boston, Tex.*, 875 S.W.2d 753, 756 (Tex. App. – Texarkana 1994, no writ).

---

[21] This is true under Texas law even when the allocation of the burden of proof under Fed. R. Bankr. P. 4003(b) is not implicated. *See, e.g., Wilcox v. Marriott*, 103 S.W.3d 469, 472 (Tex. App. – San Antonio 2003, pet. denied); *Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 314 (Tex. App.– Houston [14th Dist.] 1983, writ ref'd n.r.e.).

Thus, it depends upon the case and whether the trier of fact believes that the conveyance was bona fide or pretended.[22] Particularly when there are no third-party rights at stake, courts interpreting Texas law have not hesitated to sustain the continued existence of homestead rights even when a conveyance to a corporation appeared to have alienated the homestead tract.[23] *See, e.g.*, *Anglin,* 135 Tex. at 196, 141 S.W.2d at 940 [noting that "the character of an instrument, such as the deed now under consideration, was to be determined by the intent with which the grantors executed and the grantee received it"]; *McGahey v. Ford*, 563 S.W.2d 857,862 (Tex. Civ. App. – Fort Worth 1978, writ ref'd n.r.e.) ["Because the transfer of the property to the corporation was in violation of Tex. Const. art. 16, §50, the property retained its homestead character and could not be properly mortgaged for any purpose other than purchase money or improvements."]; *see also, Rubarts v. First Gilbraltar Bank (In re Rubarts)*, 896 F.2d 107 (5th Cir. 1990); *and FirstBank v. Pope*, 141 B.R. 115 (E.D. Tex. 1992).[24]

---

[22] A pretended sale of the homestead cannot transfer legal title. *Ortega v. LPP Mortgage, Ltd.*, 160 S.W.3d 596, 602 (Tex. App.– Corpus Christi 2005, pet. denied). Thus, if the deed to the corporation was executed as part of a pretended sale, the corporation could not have transferred any interest in the property to the Bank because the corporation would not have had any legal interest in the property.

[23] And there are certainly cases in which a conveyance has been upheld as bona fide under the evidence as presented. *See, e.g. Nowlin v. Wm. Cameron & Co.*, 54 S.W.2d 1035 (Tex. Civ. App. – Fort Worth 1932, writ ref'd) [acknowledging that "the evidence does not raise any question that the corporation was merely a cloak for fraud. All the testimony is that it was bona fide and that appellant [the party claiming the homestead right] intended and believed that the corporation owned the business" but noting that homestead rights would have been protected under Texas law if the attempt to strip the property of its homestead character through a conveyance had been only colorable.]. *Id*. at 1036.

[24] Difficulties have emerged in this area when courts have attempted to homogenize the Texas homestead decisions in order to present a universal rule and thereby eliminate ad hoc determinations.

In this instance we have individual debtors in need of money who were willing to pledge a portion of their homestead in order to obtain it. The Debtors asked for a loan in their individual names and that is exactly how the Bank originally processed the request. With some reflection, however, the Bank realized that the homestead protection afforded to the Debtors under Texas law would neutralize the effectiveness of its intended security. The Bank then informed the Debtors, who had not previously expressed any interest in incorporating their poultry business, that the law would preclude the intended structure of the loan transaction but that the Debtors could get around this prohibition and access the desired funds if they would simply create this corporation in order to avoid the constitutional barrier to the transaction.

The Bank was not merely a repository of information in this episode. It initiated, and thereafter actually facilitated, the homestead evasion. It suggested the formation of the corporation. It directed its attorney to prepare all of the necessary paperwork, including the creation of the corporation and all aspects of the real estate conveyance to that corporation. That attorney did not represent the Debtors. He did not represent their

---

*See, e.g., Nash v. Conatser*, 410 S.W.2d 512, 521-22 (Tex. Civ. App. – Dallas 1966, no writ) citing cases which were clearly fact-driven. However, Texas courts have historically not supported that approach, *see* the latter decision of *McGahey,* and a close examination of the foundational cases upon which such a rule has been declared will reveal that those decisions are, in reality, fact-specific. See *Perry*, 345 F.3d at 312-13, a third-party purchaser case that upheld a bankruptcy court's evidentiary finding that the property transfer to the corporation was not a pretended sale for the purpose of securing a loan since Perry, as the party claiming the homestead right and the grantor in the conveyance of the homestead tract, had intended to transfer the property to the corporation prior to ever applying for a loan. Thus, while perhaps well-intentioned, such efforts at an across-the-board rule have complicated the situation rather than improving it.

interests. He never met with them. He never counseled them regarding the wisdom of this proposed course of action. He never informed them of the nature of the protections they were forfeiting or the risks they were assuming with regard to their home. He was simply facilitating the desire of his client to make this loan.

This course of action was never originally contemplated by the Debtors. They had no intention or desire to incorporate their business. Indeed they subsequently ignored all of the formalities attendant to that status and referenced it only upon the advice of their accountant and other professional persons. They had no intent to convey permanent ownership of their homestead property. The Court finds that they intended only to satisfy the Bank's temporary requirements and always intended to reverse the conveyance when the Bank was paid. They knew of these evasions – the incorporation and subsequent conveyance – only because of the Bank. These were the actions that the Bank told them would need to be taken in order to obtain the money. Let there be no doubt — the Debtors wanted the money. They were in financial straits and were desperate to gain access to the funds. From the outset, they were clearly willing to forego whatever rights they had to protect their homestead (and in this particular circumstance — the water supply serving the home) from creditors not otherwise capable of threatening its loss. They cared not. They desired the money — not the preservation of (to them) arcane rights. The Bank showed them the path to the money. They willingly took it.

Thus, we have a two-party dispute in which the lender has specific knowledge of the Debtors' homestead rights as to the 6.97 acres and is integral in creating and facilitating the artifice necessary to circumvent them. This is precisely the type of scenario to which the Texas constitutional homestead protections were intended to apply — notwithstanding whatever distaste one might have for this type of coercive state control over private economic transactions. As the Fifth Circuit has noted,

> We are hesitant to declare a lien unenforceable in the face of what is most charitably called a "double-cross." Nevertheless, we harbor no uncertainty as to the result that is required by Texas homestead law. In Texas a lender who is aware of the claimant's continued, actual possession of the property bears a heavy burden in its attempt to escape the reach of the state's homestead provisions. The people of Texas, through their constitution, have determined that in circumstances such as those presented here, debtors may enjoy the benefits of the homestead laws even where they employ devices designed to defeat the purposes of those laws.

*Rubarts*, 896 F.2d at 115-16.

Here the Debtors were simply executing the play that had been called by the Bank. There was no actual intent by the Debtors to sell their homestead tract in this instance. The sale of a portion of the Debtors' homestead was not a component of some overarching business plan. It was not planned at all. It simply was the implementation of the means outlined by the Bank as necessary to induce the loan of the money. If the Bank had not required it, it would not have been done. The sale was a pretense and everyone knew it. It was an act suggested by the Bank and implemented by the Debtors

-14-

to evade the homestead protections which otherwise would have precluded the Bank from protecting itself in the transaction as originally intended. This type of behavior under these circumstances cannot be condoned and the proper application of Texas law mandates that the Bank be denied the secured status to which it knew it was not entitled at the inception of this transaction.

Thus, the relief sought by the Plaintiffs' complaint is granted and any lien otherwise held by Citizens Bank upon the Debtors' 6.97-acre tract is hereby declared null and void pursuant to Art. XVI, § 50(c) of the Texas Constitution. Citizens Bank's claim of $83,044.12 asserted as a partially secured claim against the Debtors' bankruptcy estate is thereby reduced to a general unsecured claim in the stated amount.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[25] pursuant to FED. R. CIV. P. 52, as incorporated into adversary proceedings in bankruptcy cases by FED. R. BANKR. P. 7052. An appropriate judgment will be entered consistent with this opinion.

Signed on 03/26/2009

*[signature: Bill Parker]*

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[25] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.